## Case No. 2,141.
### BURCKLE v. The TAPPERHETEN.
[31 Nile, Reg. 73.]

District Court, S. D. New York. August, 1826.

SHIPPING — TITLE AND SALE OF VESSEL — PAROL EVIDENCE—ADMIRALTY JURISDICTION —FOREIGN SEAMEN.

[1. One having neither the actual nor constructive possession of a vessel, nor the right of possession, cannot transfer a good title thereto.]

[2. A power of attorney authorizing a person to receive a vessel from her commander, and to sell her, does not give the right to sell the vessel until possession is delivered.]

[3. Instructions to the master of a vessel, executed at the same time with a power of attorney to another to receive and to sell her, and referred to in a previous contract in relation to the vessel, may be received to elucidate the meaning of the parties to the power of attorney.]

[4. Where a voyage of a foreign ship is broken up in a port of the United States, its courts will take cognizance of the claims of the foreign seamen, and administer, as nearly as practicable, that justice to which they would be entitled at home.]

[See note to Bucher v. Klorkgeter, Case No. 2,083.]

[In admiralty. Libel in rem by Burckle Brothers & Co. against the ship Tapperheten for supplies and repairs. Decree for libelants.]

Anthon, for libelants.

Hoffman, for ship, officers, and crew.

R. Emmet, for consul general of the republic of Colombia.

This vessel arrived at this port on the eleventh day of June last. She is documented as belonging to Michaelson & Benedict of Stockholm. She left Sweden on the twenty-sixth day of June, one thousand eight hundred and twenty-five, with a Swedish register, and all the papers necessary to constitute her the exclusive private property of Swedish subjects. She sailed from Europe, bound to Carthagena, a port in the republic of Colombia. She entered and cleared from that port as a Swedish vessel, arrived and entered at the port of New York, in that character, and remains here with all the original evidences of Swedish title, in the exclusive possession, and under the exclusive control, of the agent of the Swedish owners. She is now libelled in court for provisions and necessaries furnished at the instance of her commander, since her arrival in this port; and if she be what she is represented and appears to be, she is undoubtedly liable for these claims.

[1] Under ordinary circumstances I should not think it necessary to look farther into the title or character of this vessel, than the documents to which I have referred, but should consider them settled and established according to the rules and principles upon which courts of admiralty are known to proceed. The consul general of the republic of Colombia has, however, interposed a claim

[1] [Name of judge not given.]

on behalf of his government, founded on an alleged transfer of this vessel by Moses Isaacs on the seventeenth day of July last. It has, therefore, become proper to examine by what authority Mr. Isaacs undertook to transfer this vessel, and what have been the effects of his acts. By the evidence and papers before the court, it seems that sometime previous to the month of June, one thousand eight hundred and twenty-five, the vessel in question became the subject of a negotiation between the Swedish owners Michaelson & Benedict, and B. A. Goldsmidt & Co. of London. We are not furnished with the means of understanding fully the nature and extent of this negotiation, but that portion of it which is disclosed will be best understood by an examination of the documents and correspondence, in the order of their dates. We have nothing that tends to elucidate or explain the transaction anterior to the seventh of June, one thousand eight hundred and twenty-five. On that day, we find a paper executed by B. A. Goldsmidt & Co. referring to an agreement, which had been concluded between the officers and crew of the ship Tapperheten and Count Van Rogen, and undertaking and engaging to provide the commander, officers and crew of the said ship, who sail from a port in Sweden, with a passage from a port in Colombia back to Europe, without any expense to them. The fulfilment of this agreement by Goldsmidt is guaranteed by Michaelson & Benedict in another instrument bearing the same date. Then follows another paper, executed on the same tenth of June, by Michaelson & Benedict, entitled a power of attorney, authorizing Messrs. B. A. Goldsmidt & Co., or their assignees, to receive the ship Tapperheten, at the hands of the commanding officer, against their own receipt, or that of their assignees, and declaring that Goldsmidt & Co. are at full liberty to dispose of the ship as their legal property. At the same time Michaelson & Benedict issued their instructions to the commander of the ship, directing him to proceed to England, and request of Messrs. Goldsmidt & Co. directions where and to whom he should deliver the ship, and to procure, before the delivery of the ship, letters of credit, for the sending home of that part of the crew who, after the expiration of their contract, do not wish to remain in America, and to demand from Goldsmidt & Co., or their assignees, a due and legal receipt for the delivery of the ship. Goldsmidt & Co. did not receive or accept the ship in England; but under date of the 3rd of May, 1825, directed the commander to proceed to the port of Carthagena in the republic of Colombia, and to deliver the vessel to the person, who might be stated in a letter to be addressed to him by their agent, S. Liedorsdorf. On the arrival of the ship at Carthagena, the commander is referred by S. Liedorsdorf, in his letter dated 19th of June, 1825, to Mr. M. Isaacs, and requested to take his direc-

tions in relation to her. Mr. Isaacs also produced to the commander the power of attorney from Michaelson & Benedict to Goldsmidt & Co., with an endorsement thereon, authorizing him, the said Mr. Isaacs, on his order, to receive the said ship. Upon the production of this authority, the commander of the ship tendered her to Mr. Isaacs, and offered to surrender her to him, upon his complying with the contract of Messrs. Goldsmidt, and the instructions of Messrs. Michaelson & Benedict, in relation to the officers and crew of the ship. These conditions, Mr. Isaacs said, he was not then prepared to fulfil. In this state of uncertainty and perplexity, the commander remained with his ship at Carthagena, from November, one thousand eight hundred and twenty-five till March eighteen hundred and twenty-six. It was then proposed by Messrs. Liedorsdorf and Isaacs that she should proceed to New York, and Mr. Isaacs entered into a written assurance or engagement, under date of the sixth of March, that the stipulations in the contract of Messrs. Goldsmidt, and the instructions of Messrs. Michaelson & Benedict, should then be complied with. On the twenty-seventh of March accordingly, the commander set sail from Carthagena for New York, and arrived there on the eleventh of June last. Here at least, in pursuance of the reiterated contracts and assurances of Goldsmidt and his agents, the commander of this ship had a right to anticipate a termination of his embarrassments; but all again ended in delusion and disappointment. After having been detained five months at Carthagena, by the agents of Goldsmidt, and made a voyage from thence to New York, for their convenience, and at their solicitation, all his just expectations are again defeated. Mr. Isaacs, under date of the first of July, informs him that he has neither the means nor the power to comply with his own engagement entered into at Carthagena, nor with the original contract of his principals; and thus the master of the ship, with four hundred men, are abandoned in a distant and a foreign land, without resources of any kind, and in the actual want of daily subsistence.

Mr. Isaacs, throughout this very singular and extraordinary transaction, distinctly recognizes the claims of the commander, and the conditions upon which alone this vessel could be delivered to him, and yet claims the right to transfer and deliver her to a third party before he has complied with them, before he has put himself in a situation, or established his own right, to receive her. This could only be done by a compliance with the engagements of his principals, and the terms upon which the vessel was to be delivered. Having never consummated his own right to the delivery or the possession, it was futile and absurd to demand a delivery of the possession to a third party. But a more serious difficulty to the farther progress of Mr. Isaacs

is disclosed in the communication. He states that, under the date of the 13th of May, he has been instructed by Messrs. Goldsmidts to "have nothing farther to do with her (the vessel) or her crew," and in referring to the letter of Mr. Goldsmidt, we find that he is instructed to consider his engagements in their affairs at an end. Mr. Isaacs therefore finds it necessary to take new ground. He disclaims being the agent of Messrs. Goldsmidts, but resolves to act, as he terms it, in his own individual capacity, and in his own right demand a surrender of the ship. He can no longer act, he says, as the agent of the Messrs. Goldsmidts in the execution of their contract, or in the fulfilment of any of their stipulations in relation to the vessel; but as an individual will exercise the right to transfer her to whom he pleases. In pursuance of this intimation, in his letter of the 1st, Mr. Isaacs accordingly, on the 17th of July, informs the commander that he has transferred the vessel to the Colombian government. "You will, therefore, be pleased," he says, "to understand yourself with the agent of the said government in every matter relating to the ship;" by which he meant, no doubt, that the master should supplicate the agent of that government for subsistence, and for a compliance with obligations and duties which Goldsmidt and his agent, not the Colombian government, were bound to fulfill and perform. This was adding insult to injury, and having thus multiplied and aggravated the evils connected with this affair, he suddenly departs for Europe without making a provision of any sort for the support and subsistence of four hundred men, who had been engaged in this unprofitable service by his principals, and brought into this port by his own delusive promises. A more reprehensible disregard of the obligation of contracts and assurances will not often, I trust, be presented to this court.

What had the commander of this ship to do with the Colombian government or its agent? He had no contract with either to supply his daily wants, to pay off his crew, and send them home. Goldsmidt had entered into such a contract in Europe, and Isaacs himself entered into another with the commander at Carthagena, to the same effect. To them he had a right to look for support and indemnity. He was neither required nor authorized to look elsewhere. This transaction is distinguished by so much inconsistency, irregularity, and want of punctuality, to say the least of it, that I hardly know in what light to view it. And it is not the least extraordinary feature in it, that the Goldsmidts, in their correspondence with Isaacs, and in the face of their solemn contract, should state that it does not belong to them to provide for the disbursements which the crews may require, and that he, Isaacs, must have nothing to do with them. Amidst all these perplexities, the commander of the ship seems to have acted with great judg-

ment, with consummate prudence, and with a high and scrupulous regard to the safety of those under his command, to the laws of his country, and the interests of his owners. He held fast to the property, and most rightfully refused to surrender it, but in conformity to his instructions, and on a compliance with the contracts between the parties. He held it thus, until by due and legal process, it was taken into the custody of this court, where it now is, to answer all just and legal claims against it.

I have stated the facts connected with this transaction, as they are proved by the documents and the testimony before the court. Under these circumstances Mr. Isaacs has attempted to transfer this vessel to the consul general of the government of Colombia. In whatever capacity Mr. Isaacs may have attempted to make this transfer, whether in his own individual capacity, or as agent, the act was futile and nugatory. He could transfer nothing, for he had nothing to transfer. He had neither the actual nor constructive possession of the vessel. He had never attained the right of possession, and had not a shadow of title to the property. Mr. Isaacs, at all events, could have no better claim or title to this ship than his principals, Goldsmidt & Co. They never had a title that would be sustained by any judicial tribunal, or recognized in any commercial country. They never had a bill of sale, or any instrument that amounted to a conveyance of title, upon any known principle of law. The register was never transferred or changed, possession of the ship was never delivered or surrendered in any manner, and never was intended to be, but upon conditions which have never been complied with. The only document or paper Goldsmidt & Co. ever received from Michaelson & Benedict was not a bill of sale, or a conveyance of the title, but a power of attorney, so entitled by them, and so in fact and form. By this power of attorney, they were authorized to receive the vessel from the commander, and, having received her, to sell her. They could not receive her until the commander was ready and willing to deliver her, and if they did not receive her, they certainly could not sell her. A previous delivery to them was essential to their right to sell. Delivery of possession is always a very important and essential ingredient in the title to a ship. Wherever it is possible to be made, it is necessary to the perfection of the title, even where there is a regular and formal conveyance. In this case, not only no delivery of the possession, either actual or symbolical, has ever been made, but has been uniformly and peremptorily refused until the terms of the original instructions were fulfilled. Without a delivery of the possession, no title whatever could pass, no right or authority of any kind over the vessel could be exercised, by virtue of any document in the possession of Goldsmidt & Co.

The power of attorney to Goldsmidt, and the instructions to the commander, were dated and executed at the same time, viz., the tenth of June, eighteen hundred and twenty-five, and, if not actually parts of the same instrument, may undoubtedly be received to explain and elucidate the meaning of the parties. These instructions are framed in reference to the contract entered into by Goldsmidt & Co. on the 7th of June, and explicitly forbid the commander to deliver the ship, but upon a compliance with the terms of that contract, which terms are repeated in the instructions. These instructions have been obeyed,—the intentions of the owners have been fulfilled,—the delivery of the vessel has been refused, and the want of it, has in my judgment, rendered ineffectual and wholly inoperative the only instrument upon which the claim of Goldsmidt or his agent is founded. To test the title to this vessel, let us suppose that Michaelson & Benedict, like Goldsmidt & Co., had become unfortunate; to whose creditors would this property be adjudged? Most indubitably and necessarily, to Michaelson & Benedict. The register, and all the usual evidences of title, standing in their name, coupled with the actual and unimpaired possession, is all that is requisite to constitute in them a good and valid title to the ship. Nothing has been done in pursuance of the agreements between the parties in reference to this ship. The power to receive, and the instructions to deliver, remain unexecuted, and the vessel is in the same state as when she left Sweden. If the vessel had ever been delivered to Goldsmidt & Co., they might, in execution of the power of attorney to them, have sold and transferred her; but, never having received her, their authority has never been consummated, and they could exercise no power over her. It follows, of course, that their agent Isaacs derived none from them; and unless he can shew that a delivery has been made to him, as the agent authorized to receive her, his transfer, whatever may be its operation, as between the Colombian government and Goldsmidt & Co., can have no effect whatever upon the other parties, Michaelson & Benedict. This view of the question admits Mr. Isaacs to have been the agent of Goldsmidt at the time the transfer was made by him, but he was not. All his powers had been revoked before the 17th July. On that day he had no power to receive, and therefore could have none to transfer, the vessel. His pretended individual right is not worthy of animadversion. I am clear, therefore, that the claim of the Colombian government cannot be maintained, but must be rejected.

This vessel then being the private property of Messrs. Michaelson & Benedict, merchants of Stockholm, is, as I have before stated, liable for necessaries furnished her in this port, and she is ordered to be sold according to the prayer of the libelants. Since the filing of the libel in this case, the seamen have presented and filed claims for wages. This

court, in conformity to the established rule of the courts of admiralty in this country, is always cautious in taking cognizance of the claims and disputes of the crews of foreign ships. As a general rule, they are referred for redress to the laws and tribunals of their own country. Where, however, by accident or from necessity, the voyage is broken up or terminated here, we entertain their complaints, and, as nearly as practicable, administer to them that justice to which they would be entitled at home. If they have entered into contracts there, in relation to their service, we endeavor to carry them into effect, as far as we can, according to their letter or their spirit. In this case, a contract is produced, entered into in due form, before the proper authorities in Sweden, and I shall adopt that contract as my guide, in decreeing wages to the crew, and compensation to the persons named in it. The commander of this ship is bound to return the men under his command to their own country. Michaelson & Benedict, the owners, have guaranteed the contract of Goldsmidt, to provide means to enable the officers and crew to return to their own country. Out of the property then, in the hands of the court belonging to these parties, it is fit and proper that this provision should be made, if the proceeds of the sale prove sufficient. In contemplation of such an order, I directed an estimate to be made of the probable expense of transporting the officers and crew to Sweden. It was furnished by the officers, and when it came in, I referred it to the clerk and two merchants to be examined and reported upon. The clerk associated to himself J. W. Schmidt, Esq., consul of his Prussian majesty, and —— Pederson, Esq., the Danish consul, resident in this port. The estimate furnished by these gentlemen exceeds in amount that of the officers. Of the two, I shall adopt the latter, with some modification. It will be seen that I have now settled all the principles presented by this case. The detailed allowances, appropriated to the various objects of supplies and necessaries, wages of the seamen, and expenses of transportation home, will all be particularly set forth and specified in the decree to be entered in conformity to this decision.